[949 NE2d 949, 926 NYS2d 1]

In the Matter of Dylan C., a Person Alleged to be a Juvenile Delinquent, Respondent. Presentment Agency, Appellant.

Argued January 17, 2011; decided April 5, 2011

**POINTS OF COUNSEL**

*Michael A. Cardozo, Corporation Counsel*, New York City
(*Deborah A. Brenner* and *Kristin M. Helmers* of counsel), for ap-
pellant. Because a nonsecure detention facility for juvenile
delinquents is a "detention facility," the petition sufficiently al-
leged acts constituting escape in the second degree. (*People v
Ortega*, 69 NY2d 763; *Reddington v Staten Is. Univ. Hosp.*, 11
NY3d 80; *Majewski v Broadalbin-Perth Cent. School Dist.*, 91
NY2d 577; *People v Walker*, 81 NY2d 661; *Samiento v World
Yacht Inc.*, 10 NY3d 70; *Matter of Raritan Dev. Corp. v Silva*, 91
NY2d 98; *People v Finnegan*, 85 NY2d 53, 516 US 919; *People v
Zimmerman*, 9 NY3d 421; *Matter of Yong-Myun Rho v Ambach*,
74 NY2d 318; *Finger Lakes Racing Assn. v New York State Rac-
ing & Wagering Bd.*, 45 NY2d 471.)

*Legal Aid Society*, New York City (*Marcia Egger, Steven A.
Banks, Tamara A. Steckler* and *Lori Masco* of counsel), for re-
spondent. A "nonsecure detention facility," which under the
Family Court Act and the Executive Law is defined as a setting
devoid of restrictive construction, hardware, and procedures
that provides temporary care and maintenance of juveniles
awaiting Family Court Act article 3 and article 7 proceedings, is
outside the category of a "detention facility" as defined in sec-
tion 205.00 (1) of the Penal Law. (*People v Ortega*, 69 NY2d 763;
*Matter of Jahron S.*, 79 NY2d 632; *Matter of Benjamin L.*, 92
NY2d 660; *People v Nancy C.*, 188 Misc 2d 383; *Matter of Ellery
C.*, 32 NY2d 588; *Shimamoto v S&F Warehouses*, 99 NY2d 165;
*Matter of Seaman*, 78 NY2d 451; *Anglin v Anglin*, 80 NY2d 553;
*Matter of Plato's Cave Corp. v State Liq. Auth.*, 68 NY2d 791;
*Alifieris v American Airlines*, 63 NY2d 370.)

**OPINION OF THE COURT**

Chief Judge LIPPMAN.

Respondent Dylan C. ran out the door of the nonsecure
juvenile detention facility to which he had been remanded

pending his adjudication upon a juvenile delinquency petition. For absconding, he was charged in a second juvenile delinquency petition with the commission of acts which, if performed by an adult, would constitute the crime of escape in the second degree (Penal Law § 205.10 [1]), a class E felony. Family Court granted respondent's motion to dismiss the petition alleging escape upon the ground that elopement[1] from a nonsecure facility did not fall within the proscription of the felony escape statute relied upon by the presentment agency (20 Misc 3d 942 [Fam Ct, Kings County 2008]). The Appellate Division in a thorough and thoughtful opinion affirmed, essentially upon the same ground (69 AD3d 127 [2d Dept 2009]), and we, having agreed to review the Appellate Division's decision and order (14 NY3d 710 [2010]), now, also affirm.

The felony escape statute setting forth the offense presently alleged against respondent, Penal Law § 205.10 (1), provides in relevant part that "[a] person is guilty of escape in the second degree when: 1. [h]e escapes from a detention facility." "Detention [f]acility" is, in turn, pertinently defined in Penal Law § 205.00 (1) as "any place used for the confinement, pursuant to an order of a court, of a person (a) charged with or convicted of an offense, or (b) charged with being or adjudicated a youthful offender, person in need of supervision or juvenile delinquent."

It is clear from the just quoted language that respondent escaped from a "detention facility" within the literal description of Penal Law § 205.00 (1) (a) and (b), and, if that language were to be considered in isolation, it would dictate the conclusion that the conduct of which respondent is accused is proscribed by Penal Law § 205.10 (1). However, article 3 of the Family Court Act, the body of law specifically governing the disposition and treatment of juveniles, such as respondent, detained while awaiting adjudication of delinquency charges (*see* Family Ct Act § 301.1), does not equate detention with confinement, as does the Penal Law, but rather defines it for purposes of the article more broadly as "the temporary care and maintenance of children away from their own homes" (Family Ct Act § 301.2 [3]). And, in that connection, article 3 has, since

---

1. While the dissent finds the use of this term amusing in this decidedly nonromantic context, it is a term more widely used and specifically with reference to the act of leaving a facility without permission (*see e.g.* 10 NYCRR 405.8 [b] [5]; 405.22).

the enactment of the above-quoted Penal Law provisions, introduced a distinction, not articulated in the Penal Law, between secure detention facilities, i.e., "facilit[ies] characterized by physically restricti[ve] construction, hardware and procedures" (Family Ct Act § 301.2 [4]), and nonsecure detention facilities, i.e., "facilit[ies] characterized by the absence of physically restricti[ve] construction, hardware and procedures" (Family Ct Act § 301.2 [5]). The distinction is, we believe, crucial in judging the reach of the subject second-degree escape statute, not simply because it is no small measure anomalous to speak of "escaping" from a facility "characterized by the absence of physically restricti[ve] construction, hardware and procedures," but because we have specifically held in *People v Ortega* (69 NY2d 763 [1987]) that "a nonsecure facility does not constitute a detention facility within the meaning of Penal Law § 205.00 (1)," and, accordingly that one may not commit the crime of escape in the second degree by leaving such a facility without permission (*id.* at 764).[2]

There is, of course, a tension between the literal significance of the relevant Penal Law provisions and *Ortega*'s carve-out for nonsecure facilities. *Ortega* involved an alleged escape from a nonsecure psychiatric hospital, and its carve-out was explained as warranted by the very different objectives of secure and nonsecure psychiatric commitment. Secure commitment, we recognized, had as a principal objective the protection of the public, a purpose obviously frustrated by escape and vindicated by subjecting an escapee to serious criminal sanction. The dominant purposes of nonsecure commitment, therapy and rehabilitation (69 NY2d at 764-765), however, would not have been similarly advanced, and could in fact have been significantly impaired, if on every occasion that a psychiatric patient wandered off the grounds of the nonsecure facility to which he or she had been committed, there arose the possibility of a felony prosecution. The question now posed is whether there is some sensible, statutorily relevant distinction to be made

---

**2.** Contrary to the dissent, we were necessarily aware at the time *Ortega* was decided that Bronx Psychiatric Center, the facility from which Ortega absconded, was, while nonsecure in contrast to Mid-Hudson Psychiatric Center (the secure psychiatric facility at which Ortega had initially been hospitalized following his insanity acquittal), nonetheless a facility at which involuntarily committed individuals, among them Ortega, were detained. We expressly noted that, notwithstanding Ortega's transfer to the nonsecure facility, he remained in the custody of the Commissioner of Mental Health (69 NY2d at 764-765).

between a nonsecure psychiatric facility and a nonsecure juvenile detention facility.

Inasmuch as both are designed to detain but not imprison, and to rehabilitate rather than punish, and neither has as a principal end the protection of the public—that objective being present in both cases but necessarily subordinate to the creation of a salutary therapeutic milieu for troubled but presumably not particularly dangerous persons (*see Sebastian v State of New York*, 93 NY2d 790, 795 [1999])—it is difficult to discern for present purposes any cogent distinction between the two types of facilities. It would moreover be entirely incongruous to treat an adult acquitted of rape upon a plea of insanity with impunity for his escape from a nonsecure psychiatric facility, as we did in *Ortega*, but to deem a child awaiting adjudication upon a juvenile delinquency petition answerable to a felony grade charge for taking his leave of the nonsecure detention facility to which he had been remanded, through its evidently unlocked door.[3] Having with good reason and humane purpose read the second-degree escape statute as we did some 24 years ago, it would not be prudent now to apply the statute in the evidently disparate manner proposed by petitioner.

Although petitioner protests that there will be untoward consequences if second-degree escape is not made available as a charge whenever a juvenile detained pending adjudication of juvenile delinquency charges leaves a nonsecure detention facility without permission, there appears little reason to suppose that that is so. It may well be desirable that some significant consequence attach to a child's noncompliance with the conditions upon which a nonsecure remand is made, but the filing of a new petition alleging felony escape is demonstrably inessential to that purpose. In the event of noncompliance, a child may without the need of a new juvenile delinquency petition, but in

---

**3.** The door, we note, cannot be supposed to have been left unlocked by accident, since, as the Department of Juvenile Justice explains on its Web site, "[w]hile locks on the doors and other hardware distinguish Secure Detention, [nonsecure detention (NSD)] is characterized by the absence of such restrictions. Residents are staff-supervised and may leave the NSD group homes to attend community programs if escorted by staff" (http://www.nyc.gov/html/djj/html/faq.html [accessed Mar. 18, 2011]; *see also* Sobie, Practice Commentaries, McKinney's Cons Laws of NY, Book 29A, Family Ct Act § 301.2, at 371-372 ["(t)he essential distinction (between secure and nonsecure facilities for juveniles) is that a non-secure facility is 'open' or not locked. In a sense, the term is an oxymoronic phrase; the usual non-secure setting, a community group home or open campus-like structure, would not be deemed to be 'detention' by most lay persons"]).

accordance with a provision in the order detaining him or her, be directly transferred to a secure facility, as indeed respondent was.

Accordingly, the order of the Appellate Division should be affirmed.

SMITH, J. (dissenting). On the face of the applicable statutes, the result the majority reaches seems impossible. The question is whether "non-secure detention facilities" (so named by statute, Executive Law §§ 503, 504) are detention facilities—a question that answers itself. The obvious conclusion is reinforced by the statutory definition of "detention facility": "any place used for the confinement, pursuant to an order of a court, of a person . . . charged with being . . . a . . . juvenile delinquent" (Penal Law § 205.00 [1] [b]). Dylan C. was charged with being a juvenile delinquent and remanded by order of the Family Court to the Catholic Guardian Non-Secure Detention Center. Any argument that the facility was not used for his "confinement" must deal with the awkward fact that, when Dylan walked out the door, a facility employee chased him and brought him back. Indeed, the relevant statutes fit the facts here so well that the majority, to avoid calling Dylan's act an "escape"—the act with which he is charged—uses instead the word "elopement" (majority op at 616), which usually refers to a more romantic event.

Acknowledging that the "literal" words of the statute do not support its holding (majority op at 616), the majority finds justification for disregarding those words in *People v Ortega* (69 NY2d 763, 764 [1987]), which does indeed say: "a nonsecure facility does not constitute a detention facility." *Ortega* dealt with a psychiatric facility, not one for the detention of juvenile offenders. The words "non-secure *detention* facility" do not appear in *Ortega*. It is not apparent that we were aware, when we wrote our memorandum decision in *Ortega*—devoting only two sentences to the question of what "detention facility" means—that such a thing as a "non-secure detention facility" existed.

The majority makes a reasonable argument that a mentally ill adult, like the *Ortega* defendant, who flees from confinement is probably not less dangerous than a fleeing juvenile offender like Dylan. I would not, however, extend the *Ortega* decision to the limits of its logic. I would confine *Ortega* to its facts, and apply to this case the statutes as they are written.

Judges CIPARICK, GRAFFEO and JONES concur with Chief Judge LIPPMAN; Judge SMITH dissents and votes to reverse in a separate opinion in which Judges READ and PIGOTT concur.

Order affirmed, without costs.